Gregory D. Phillips (USBN 4645)
PHILLIPS WINCHESTER
4001 South 700 East, Suite 500
Salt Lake City, Utah 84107
Tel: (801) 935-4932
*gdp@phillipswinchester.com*

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| XMISSION, L.C., a Utah company,<br><br>Plaintiff,<br><br>vs.<br><br>MODARAMO MEDIA, LLC DOES 1-10,<br><br>Defendants. | **PLAINTIFF'S MOTION FOR LEAVE TO CONDUCT DISCOVERY LIMITED TO THE ISSUES OF PERSONAL JURISDICTION AND STANDING, AND REQUEST FOR STAY OF MOTION TO DISMISS**<br><br>**Case No. 2:22-cv-00199-DBB-CMR**<br><br>**Judge Barlow**<br><br>**Magistrate Judge Romero** |

Plaintiff, XMission, L.C. ("XMission" or "Plaintiff"), through its attorneys, respectfully moves the Court for entry of an Order granting XMission leave to conduct discovery limited to the issues of whether defendant Modaramo Media ("Defendant") is subject to the personal jurisdiction of the Court, and the question of procurement vis-à-vis standing. XMission also requests a stay of the *Motion to Dismiss* [Doc 7] until after jurisdictional discovery is complete, which XMission anticipates will take 120 days.

1

As detailed below, the law of this Circuit authorizes jurisdictional discovery where there is doubt about the underlying facts regarding personal jurisdiction. XMission specifically seeks discovery relating to:

1. Defendant's agency relationship with its affiliates in Utah and otherwise, including the existence and enforcement of compliance protocols.

2. Defendant's unsubscribe practices and protocols, including specifically, data pertaining to unsubscribe requests from XMission's customers and other Utah IP addresses.

3. The Domains owned, controlled, and/or used by Defendant to send emails directly or through affiliates, and any corresponding opt-in information.

4. Defendant's lead generation activities, and to what extent Defendant generates lead from consumers in Utah through its email practices.

5. Defendant's revenue generated from Utah, including whether the revenue was generated from commercial emails sent to Utah, or by the sale, transfer or exchange of Utah leads.

6. Defendant's relationship with its marketing affiliates, and what efforts Defendant made to verify and confirm that its affiliates complied with the law in sending emails on Defendant's behalf.

Wherefore, XMission respectfully requests that the Court enter an Order granting Plaintiff leave to conduct discovery limited to the issue of the Court's personal jurisdiction over the Defendant, and the question of procurement vis-à-vis standing, and that the Court stay the *Motion to Dismiss*, until after the discovery is complete.

## LEGAL STANDARD

Generally, when "a defendant moves to dismiss for lack of jurisdiction, either party should be allowed discovery on the factual issues raised by that motion." *Budde v. Ling-Temco Vought, Inc.*, 511 F.2d 1033, 1035 (10th Cir. 1975). The court has broad discretion in deciding whether to grant jurisdictional discovery, but abuses that discretion when a denial of discovery prejudices a litigant. *Sizova v. Nat. Inst. of Standards & Tech.*, 282 F.3d 1320, 1326 (10th Cir. 2002). Prejudice is present where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary. *Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1326 (10th Cir.2002)).

## ARGUMENT

The Tenth Circuit has stated, as a general rule, that parties facing a motion to dismiss based upon jurisdictional grounds (subject matter or personal) should be allowed to conduct discovery into the factual averments upon which the motion is based. "When a defendant moves to dismiss for lack of jurisdiction, either party should be allowed discovery on the factual issues raised by that motion." *Sizova v. Nat'l Inst. of Standards & Tech,* 282 F.3d 1320, 1326 (10th Cir. 2002); *see also Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 n.13 (1978) ("[W]here issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues."); Wright & Miller, 8 *Fed. Prac. &Proc. Civ. 2d* § 2009 ("Although there was once doubt on the point, it has long been clear that discovery on jurisdictional issues is proper.").

A refusal to grant jurisdictional discovery "constitutes an abuse of discretion if the denial results in prejudice to a litigant. Prejudice is present where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary."

*Sizova*, 282 F.3d at 1326 (citation and court's ellipse omitted; reversing the dismissal of a complaint on subject matter jurisdiction grounds without being allowed limited discovery.)

Here, XMission faces a *Motion to Dismiss* based on a lack of personal jurisdiction and standing wherein Defendant asserts facts on controverted issues bearing on the question of jurisdiction for which discovery is necessary. Thus, XMission should be allowed to conduct discovery into Defendants' allegations or it will suffer prejudice.

Specifically, through its *Motion to Dismiss*, Defendant paints an incomplete, if not wholly inaccurate, picture of its business. In challenging jurisdiction, Defendant represents to the Court that it is a "human relations" company who operates exclusively with clients in New York. It further submits that it "does not provide marketing services or advertising services directly or indirectly . . . ." It further states that it does not send email. However, Defendant's description of its business on its own website at *modaramomedia.com*, paints an entirely different story which directly contradicts Defendant's representations to the Court. (*See* Web Capture of *modaramomedia.com*, Exhibit A hereto). It would appear as if Defendant, in an effort to avoid the consequences of its actions and having to answer for them in front of this Court, has advanced a false narrative.

On its website, Defendant claims to "build solutions that drive results" and describes itself as an "omnichannel performance marketing company." (Exhibit A). Defendant's "solutions" include "affiliate marketing," and "lead generation." (*Id.*) Defendant boasts: "We manage the distribution of your advertising campaign utilizing our proprietary optimization technology to help you drive more transactions." (*Id.*)

Over a relatively short period of time, XMission received thousands of emails that all had a similar look and feel. (*See Declaration of Peter* Ashdown, ¶ 3, Exhibit B hereto.) The majority of the emails contained generic advertising to no company in particular—typically disguised as newsletters. (*Id.*) The emails had all the markings of lead generation spam (*i.e.*, emails designed to induce consumers to click links and provide personal information which could then be used as a sales lead)—the exact type of lead generation activities advertised on Defendant's website. (*See id.* at ¶ 4.)

Pursuant to agreements with its customers, XMission clicked available opt-out links in emails in an attempt to get the spam to stop. (*Id.* at ¶ 5.) These efforts appear to have had little to no effect. (*Id.*) XMission also recorded redirect data embedded in the email links in an effort to identify the responsible party. (*Id.* at ¶ 6.) Over 9,000 of the emails contained the redirect link mdrtrck.com. (*Id.* at ¶ 7.)

Some of the emails advertised identifiable brands such as the 1tac Tactical Flashlight. (*Id.* at ¶ 8.) The 1tac emails led XMission to a company called Columbus, the seller of the 1tac Tactical Flashlight, who identified mdrtrck.com as belonging to Defendant, one of Columbus's marketing affiliates. (*Id.* at ¶ 9.) In other words, all emails containing mdrtrck.com in the redirect data is an email sent by, or on behalf of, Defendant. Defendant's website admits that it sends emails—it "manages the distribution (*i.e.*, emailing) of . . . Advertising campaigns" with the purpose of "driv[ing] more transactions." The more than 9,000 emails in this case are examples of just that.

Defendant intentionally transmits emails with a marketing purpose, has transmitted thousands of emails to XMission's servers in Utah, and has failed to opt-out XMission customers

upon request. Not only does the evidence XMission has found to date directly contradict Defendant's sworn declaration regarding its business and its involvement in email advertising, it also illustrates that Defendant cannot be taken at its word. To this point, discovery is necessary to address Defendant's claim that it has no contacts with Utah that would subject it to jurisdiction here.

To further Defendant's self-serving jurisdiction claims, and in order to adequately respond to the pending *Motion to Dismiss*, XMission requires discovery regarding:

1. <u>Defendant's unsubscribe practices and protocols, including specifically data pertaining to unsubscribe requests from XMission's customers and other Utah IP Addresses.</u>

XMission is confident that discovery will show that this case is far more similar to *XMission v. Click Sales, Inc.*, than it is to *XMission v. Fluent*.

On a challenge to personal jurisdiction, the Court in *XMission v. Click Sales* found:

> First, ClickBank creates and sends emails promoting some of its own ventures, such as ClickBank University, directly to XMission customers in Utah. Although ClickBank argues that ClickBank's direct emails are not spam, XMission alleges that the emails violate CAN-SPAM because XMission requested that its customers be unsubscribed from the emails and ClickBank continued to send them.

*XMission v. Click Sales, Inc.*, Case No. 2:17cv1287DAK, *Memo. Decision and Preliminary Injunction Order*, 7 (D. Utah, April 11, 2019). The Court further explained:

> XMission has an automatic unsubscribe system that notified ClickBank of its customers' desires to unsubscribe to future ClickBank emails. The nature of XMission's CAN-SPAM claims against ClickBank for allegedly violating the unsubscribe request by sending subsequent emails to its Utah customers, necessarily alleges that ClickBank knew it was sending those subsequent emails into Utah. Therefore, even if ClickBank contends that it sends ClickBank University emails indiscriminately to every state in the nation and therefore no

state in particular, such an email sent to a Utah customer after that Utah customer has requested no further such emails is "directed" at Utah because ClickBank is already on notice not to send the email to that customer in Utah.

*XMission v. Click Sales, Inc.*, *Memo. Decision and Preliminary Injunction Order*, 8 (D. Utah, April 11, 2019).

Here, not only does XMission allege that Defendant sent its own emails which violate the CAN-SPAM Act, it also has evidence that XMission customers continued to receive emails after opt-out requests, which opt-out requests must have been honored by Defendant, and would have come from traceable IP Addresses in Utah. Therefore, discovery regarding Defendant's suppression practice and protocols, and its opt-out data, specifically from consumers located in Utah, or Utah IP Addresses, is necessary as such will likely demonstrate Defendant's knowledge that it received unsubscribe requests from Utah, and in some cases, failed to honor them by continuing to send email into Utah.

2. <u>The Domains owned, controlled, and/or used by Defendant to send emails directly or through affiliates, and any corresponding opt-in information.</u>

In *XMission v. Click Sales, Inc.*, the fact that Click Sales transmitted emails directly to consumers in Utah was the fulcrum to this court's decision to exercise personal jurisdiction over Click Sales. *See.* Case No. 2:17cv1287DAK, *Memo. Decision and Preliminary Injunction Order*, 7. Discovery regarding the domains owned and controlled by Defendant is likely to reveal that Defendant actively engaged in direct emailing to consumers in Utah. Further, discovery regarding opt-in data, which necessarily includes evidence of physical location, is also likely to reveal that Defendant knew that it was actively contacting consumers in Utah.

3. Defendant's lead generation activities, and to what extent Defendant generates lead from consumers in Utah through its email practices.

Defendant's website admits that it engages in lead generation. (See Exh. A.) Discovery regarding Defendant's lead generation activities, specifically regarding consumers located in Utah, or with Utah IP Addresses, is necessary as such will likely demonstrate Defendant's knowledge that, through its activities, it made repeated contact with consumers in Utah, gathered personal information from consumers in Utah, and used that information to generate revenues or on correlation with its contractual obligations to its clients.

4. Defendant's revenue generated from Utah, including whether the revenue was generated from commercial emails sent to Utah, or by the sale, transfer or exchange of Utah leads generated through emails sent to Utah.

Financial information pertaining to the specific forum (both alone and as compared to the company's income as a whole) is not only reasonable, but direct evidence pertinent to personal jurisdiction. *See Old Republic Insurance Co. v. Continental Motors, Inc.*, 877 F.3d 895, 915 (10th Cir. 2017) (holding that a factor supporting the "purposeful direction" prong of the personal jurisdiction analysis includes "high sales volume and large customer base and revenues" in the forum state).

5. Defendant's relationship with its marketing affiliates, and what efforts Defendant made to verify and confirm that its affiliates complied with the law in sending emails on Defendant's behalf.

This request relates to Defendant's agency relationship with its marketing affiliates. Agency was specifically not at issue in *XMission v. Fluent*. In fact, the Tenth Circuit stated,

8

> We do not foreclose the possibility that jurisdiction over a defendant could be based solely on activities of its agents. But that possibility is irrelevant to this case because XMission has not challenged the district court's determination that the publishers were not agents of Fluent.

*XMission v. Fluent*, 955 F.3d 833, 847 (10th Cir. 2020). Further to this point, evidence regarding the extent of Defendant's relationship with and control over affiliates can establish agency, which in turn is relevant to the Court's jurisdiction analysis. *See, e.g., Beverly Kuenzle, Wayne Kuenzle v. HTM Sport-Und Freizeitgerate AG*, 102 F.3d 453, 458 (10th Cir. 1996) (holding that a defendant "creates contacts for personal jurisdiction purposes" through third-parties acting as its agents").

As all of the foregoing will bear on the issue of personal jurisdiction and standing, and Plaintiff is without facts to fully address the issues raised by the *Motion to Dismiss*, jurisdictional discovery is necessary to avoid prejudice.

## CONCLUSION

As the Tenth Circuit has recognized, jurisdiction discovery is generally available in order to clarify and/or controvert a defendant's factual assertions regarding personal jurisdiction. In this case, Defendant has asserted that Plaintiff cannot establish personal jurisdiction over it, and lacks evidence to prove otherwise. Therefore, the Court should allow Plaintiff to conduct discovery to controvert Defendant's assertions. Jurisdictional discovery will not unduly delay the litigation or burden Defendant, and denying an opportunity for such discovery would be extremely prejudicial to Plaintiff. The Court should also stay the *Motion to Dismiss* until the requested discovery is complete, which XMission anticipates will take 120 days.

DATED this 8th day of August 2022.

                PHILLIPS - WINCHESTER

                /s/ Gregory D. Phillips

                Gregory D. Phillips